**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

**SHAUN MCCUTCHEON and
MCCUTCHEON FOR FREEDOM,**

     **Plaintiffs,**

     **v.**

**FEDERAL ELECTION COMMISSION,**

     **Defendant.**

**Civil Action No. 20-2485 (JDB)**

---

## <u>MEMORANDUM OPINION</u>

     This case raises overlapping questions of administrative and campaign finance law on the eve of the 2020 elections, projected to be the costliest—by far—in the nation's history.  <u>See</u> Ctr. For Responsive Politics, <u>2020 Election to Near $11 Billion in Total Spending, Smashing Records</u>, OpenSecrets.org (Oct. 1, 2020), <u>https://www.opensecrets.org/news/2020/10/2020-election-to-near-11-billion-in-total-spending-smashing-records/</u>.  Plaintiff Shaun McCutcheon launched a primary campaign for the Libertarian Party's nomination for president on May 1, 2020, suspending it less than a month later after the party convention.  During the pendency of his campaign, McCutcheon transferred $65,000 of his own money into his campaign committee, McCutcheon For Freedom ("MFF," together with McCutcheon, "plaintiffs").  The campaign incurred net expenditures of $10,793.08, leaving it with approximately $54,206.92 in leftover funds.

     The day after McCutcheon suspended his campaign, he sought an advisory opinion from the Federal Election Commission ("FEC") that would authorize MFF to transfer that remainder, as well as unlimited additional personal funds McCutcheon may "contribute" to his now-suspended campaign committee, to the national committees of the Libertarian and Republican

parties, notwithstanding statutory limits on the amount an individual may contribute to a national party committee.  Rather than issue the requested advisory opinion within the statutory sixty-day period, though, the FEC ultimately sent plaintiffs a letter on August 10, 2020, stating that the Commission was unable to render an advisory opinion for want of the four-member quorum required by statute to take action on advisory opinion requests.

In response, plaintiffs filed a complaint in this Court accompanied by a motion for a preliminary injunction.  In their motion, plaintiffs seek to bar the FEC from taking any action against them to enforce relevant campaign finance laws limiting contributions to political parties, as McCutcheon proposes to transfer unlimited amounts of his personal funds through his campaign committee, MFF, to the national committees of the Libertarian and Republican Parties.  In order to obtain a preliminary injunction, plaintiffs must demonstrate, among other things, that they are likely to succeed on the merits of their substantive claims.  Because they have not done so, the Court will deny plaintiffs' motion.

## BACKGROUND

### I.    Legal Background

#### A.  Campaign Finance Law

The Federal Election Campaign Act of 1971 ("FECA") regulates, in relevant part, the amount of money a person may contribute to candidates for federal office, federal political campaign committees, and national political party committees for the purpose of influencing a federal election.  See 52 U.S.C. §§ 30101–30146.  Contribution limits have withstood scrutiny under the First Amendment since the Supreme Court's seminal campaign finance decision, Buckley v. Valeo, 424 U.S. 1 (1976).  In Buckley, the Court rejected a First Amendment challenge

to caps on contributions to individual candidates, finding that "the Act's primary purpose to limit the actuality and appearance of corruption resulting from large individual financial contributions . . . [provides] a constitutionally sufficient justification" for capping individual contributions at a set dollar amount per candidate.  Id. at 26.

The same principle animates limits on contributions to political party committees, which were first enacted in Buckley's wake.  See FECA Amendments of 1976, Pub. L. No. 94-283, § 112(2), 90 Stat. 475, 487 (1976) (codified as amended at 52 U.S.C. § 30116(a)(1)(B)).  Today, under FECA, a person may not contribute more than $35,500 to a national party committee.  FEC, Contribution   Limits,   https://www.fec.gov/help-candidates-and-committees/candidate-taking-receipts/contribution-limits/ (last visited Oct. 19, 2020); see 52 U.S.C. § 30116(a)(1)(B) & (c).  A national party committee, in turn, may not "receive . . . a contribution, donation, or transfer of funds or any other thing of value, or spend any funds, that are not subject to the limitations, prohibitions, and reporting requirements of this Act." id. § 30125(a)(1).  In upholding the latter provision from a First Amendment challenge in McConnell v. FEC, the Supreme Court explained that "[t]he premise behind these restrictions [on contributions to political party committees] has been, and continues to be, that contributions to a federal candidate's party in aid of that candidate's campaign threaten to create—no less than would a direct contribution to the candidate—a sense of obligation."  540 U.S. 93, 144 (2003).  Even as Supreme Court decisions in the intervening decades have struck down other restrictions on campaign spending, the basic principle behind contribution limits—whether to individual candidates, their campaign committees, or national party committees—has survived.  See, e.g., McCutcheon v. FEC, 572 U.S. 185, 209, 227 (2014) (rejecting limits on aggregate spending by an individual across multiple campaigns but "leav[ing] the base [contribution limits upheld in Buckley] undisturbed"); Citizens United v. FEC, 558 U.S.

310, 359, 365 (2010) (striking down limits on independent corporate expenditures but recognizing that "contribution limits . . . have been an accepted means to prevent quid pro quo corruption"); accord Rufer v. FEC, 64 F. Supp. 3d 195, 203 (D.D.C. 2014) ("FECA's base contribution limits . . . remain intact after McCutcheon.").

Beyond merely imposing numerical caps on contributions, FECA safeguards against circumvention of its anti-corruption objectives.  Cf. McCutcheon, 572 U.S. at 200 ("[S]tatutory safeguards against circumvention have been considerably strengthened since Buckley was decided, through both statutory additions and the introduction of a comprehensive regulatory scheme.").  For starters, FECA prevents donors from using means other than cash to influence candidates by broadly defining "contribution" to include "any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office."  52 U.S.C. § 30101(8)(A)(i).  The Act also includes measures that prohibit donors from using intermediaries to funnel contributions to the desired recipient while formalistically complying with contribution limits.  For example, the Act clarifies that, for the purpose of calculating contribution limits, "all contributions made by a person, either directly or indirectly, on behalf of a particular candidate, including contributions which are in any way earmarked or otherwise directed through an intermediary or conduit to such candidate, shall be treated as contributions from such person to such candidate."  Id. § 30116(a)(8).  Similarly, FECA requires that "[n]o person shall make a contribution in the name of another person or knowingly permit his name to be used to effect such a contribution, and no person shall knowingly accept a contribution made by one person in the name of another person."  Id. § 30122.

Notwithstanding FECA's limits on contributions by persons, "[a] contribution accepted by a candidate . . . may be used by the candidate . . . for transfers, without limitation, to a national,

State, or local committee of a political party." Id. § 30114(a)(4). This statutory provision does not apply to all funds in a campaign account, but only to "contribution[s] accepted by a candidate."[1] See id. The Act does not define what it means for a candidate to "accept" a contribution, but it does bar candidates and political committees from "knowingly accept[ing] any contribution . . . in violation of" FECA's contribution limits. See id. § 30116(f). The Court is not aware of, nor have the parties identified, any judicial precedent or FEC advisory opinions interpreting the precise contours of when a contribution is deemed "accepted by a candidate" so as to be eligible for unlimited transfer to a party committee under § 30114(a)(4).

Contrary to constitutionally permissible limits on contributions, restrictions on campaign expenditures—whether of funds drawn from a candidate's own personal funds or raised by their campaign committees—were blocked at the gate in Buckley. Unlike the Act's contribution limits, the Supreme Court reasoned, "[t]he Act's expenditure ceilings impose direct and substantial restraints on the quantity of political speech, . . . [and] limit political expression 'at the core of our electoral process and of the First Amendment freedoms.'" Buckley, 424 U.S. at 39 (quoting Williams v. Rhodes, 393 U.S. 23, 32 (1968)). Accordingly, it held that "the First Amendment requires the invalidation of [FECA's] . . . ceilings on overall campaign expenditures." Id. at 58.

Because "a candidate's expenditure of his personal funds directly facilitates his own political speech," Buckley further established that Congress cannot limit how much of a candidate's own funds can be spent on his or her campaign. Id. at 53 & n.58. The FEC enshrined this principle in 11 C.F.R. § 110.10, which provides that "candidates for Federal office may make

---

[1] It may be that the "accepted by" limitation on transfers from campaigns to political parties does not in itself pose any meaningful restraints on which campaign funds are eligible: the FEC's regulation implementing Section 30114(a) simply provides for the unlimited transfer of "funds in a campaign account" without more. See 11 C.F.R. § 113.2.

unlimited expenditures from personal funds," and then clarified that this allows a candidate to make "unlimited contributions to his or her own campaign," FEC Advisory Op. 2003-31 at 2 (Dec. 19, 2003) (citing FEC Advisory Op. 1997-10 at 3 (Aug. 15, 1997)).

By the same token, the Supreme Court has struck down other limits on campaign spending that have the effect of banning certain forms of political expenditures outright.  In Citizens United, the Court cited Buckley's rejection of expenditure limits as it invalidated a law that imposed criminal sanctions—and thereby acted as an "outright ban"—on corporate electioneering communications.  558 U.S. at 337, 346, 365.  Four years later, McCutcheon—one of the plaintiffs here—challenged the Act's aggregate limits on contributions, which capped the amount an individual could spend in a given election cycle across all races.  See McCutcheon, 572 U.S. at 204–05.  The Court distinguished between the so-called "base limits" upheld in Buckley on the one hand (i.e., caps on the amount a person can contribute to a single candidate, campaign, or party committee), and the challenged aggregate limits on the other, which the court found to "constitute an outright ban on further contributions" to additional candidates, thereby "deny[ing] the individual all ability to exercise his expressive and associational rights by contributing to someone who will advocate for his policy preferences."  See id. at 204.  By analogizing aggregate limits to impermissible limits on expenditures, McCutcheon "le[ft] the base limits undisturbed."  Id. at 209 & n.6 (noting that McCutcheon also "does not overrule McConnell's holding about 'soft money'" limits on contributions to party committees).

B.   The FEC Advisory Opinion Process

The 1974 amendments to FECA created the FEC "and vest[ed] in it primary and substantial responsibility for administering and enforcing the Act."  Buckley, 424 U.S. at 109.  Of relevance here, the FEC is empowered "to render advisory opinions under section 30108 of this title" and

"to make, amend, and repeal such rules . . . as are necessary to carry out the provisions of th[e] Act."  52 U.S.C. § 30107(a)(7)–(8).

Section 30108, in turn, permits a person to request an advisory opinion "concerning the application of [FECA], or a rule or regulation prescribed by the Commission, with respect to a specific transaction or activity by the person," and requires the Commission to "render a written advisory opinion relating to such transaction or activity" no more than sixty days after receiving a "complete written request."  Id. § 30108(a)(1).  It further requires the FEC to publish any request for an advisory opinion and "accept written comments submitted by any interested party within the 10-day period following the date the request is made public."  Id. § 30108(d).  If the FEC renders a favorable advisory opinion in response to a request, the requestor, and any person involved in an identical transaction or activity to that described in the request, may rely in good faith on the opinion and will be protected from any sanction under FECA that might otherwise attach to the transaction or activity.  Id. § 30108(c).

Importantly here, Section 30108 does not stand alone.  Section 30106 provides that "the affirmative vote of 4 members of the Commission shall be required in order for the Commission to," inter alia, render an advisory opinion.  Id. § 30106(c).  The FEC's rules of procedure further require the presence of a four-member "quorum for the consideration and resolution of matters that involve the exercise of [the FEC's] duties and powers under the [FECA]."  FEC, Directive 10 (June   8,   1978   amend.   Dec.   20,   2007),   https://www.fec.gov/resources/cms-content/documents/directive_10.pdf.  Obviously, absent a four-member quorum, the FEC cannot generate the four affirmative votes necessary to approve or reject an advisory opinion request.  In part to square the four-vote requirement with the sixty-day window for issuing advisory opinions, the FEC promulgated a rule providing that, in lieu of a requested advisory opinion, it may issue "a

written response stating that the Commission was unable to approve an advisory opinion by the required affirmative vote of 4 members" within sixty days of receiving a complete request.  11 C.F.R. § 112.4(a).

## II.    Factual Background

The story of this case begins before the facts underlying the present action came to be.  On March 20, 2020, billionaire and former Democratic presidential candidate Michael Bloomberg announced that he was transferring $18 million from his self-funded presidential campaign to the Democratic National Committee ("DNC").  Compl. at 1–2 (citing Dan Merica et al., Bloomberg Campaign Transfers $18 Million to DNC, CNN (Mar. 20, 2020, 3:26 PM), https://www.cnn.com/2020/03/20/politics/bloomberg-campaign-money-dnc/index.html).  The following week, Dan Backer, who is plaintiffs' counsel in the present action as well as MFF's treasurer and custodian of records, filed a complaint with the FEC alleging that by transferring his campaign funds to the DNC, Bloomberg "brazenly engag[ed] in one of the largest willful campaign finance violations of all time, . . . circumvent[ing] contribution limits through the simply [sic] expedient of laundering millions of dollars through his now-defunct campaign account."  FEC MUR 7722, Compl. (Mar. 24, 2020) ("Bloomberg Compl.") at 1–2, available at https://secure.greatamericapac.com/Images/Bloomberg_FEC_Complaint.pdf.  Backer also gave multiple media interviews on his opposition to Bloomberg's contribution and authored an op-ed in the Washington Examiner headlined "Michael Bloomberg is Breaking Campaign Finance Law Before Your Very Eyes," likewise arguing that Bloomberg's transfer of funds constituted an unlawful contribution to a political party in excess of statutory limits.  Dan Backer, Michael Bloomberg is Breaking Campaign Finance Law Before Your Very Eyes, Wash. Examiner (Mar. 26, 2020),   https://www.washingtonexaminer.com/opinion/op-eds/michael-bloomberg-is-

breaking-campaign-finance-law-before-your-very-eyes; see also, e.g., Andrew Keiper, Bloomberg Campaign Hit with FEC Complaint for $18 Million Transfer to DNC, Fox News (Mar. 27, 2020), https://www.foxnews.com/politics/bloomberg-campaign-hit-with-fec-complaint-for-18-million-transfer-to-dnc (quoting Backer saying, "If you allow Bloomberg to do this, you're giving democracy to a billionaire oligarch.").  Bloomberg's highly publicized transfer of funds provides the backdrop for the present action, to which the Court now turns.

> A.  The McCutcheon Campaign

On May 6, Backer filed a Statement of Organization with the FEC on behalf of MFF officially launching McCutcheon's campaign for the Libertarian Party's nomination for president. See McCutcheon for Freedom, FEC Form 1, Statement of Organization, FEC (May 6, 2020), https://docquery.fec.gov/cgi-bin/forms/C00745661/1404556/.    McCutcheon is an Alabama businessman and political activist who rose to national notoriety in 2014, when he prevailed in the aforementioned Supreme Court case that struck down statutory limitations on the aggregate amount an individual can contribute to political campaigns in a given election cycle.   See McCutcheon for Freedom, https://mccutcheonforfreedom.com (last visited Oct. 19, 2020); McCutcheon, 572 U.S. at 194–95.

To advance his presidential campaign, McCutcheon produced and posted a campaign video, launched a campaign website, placed online advertisements, and sent campaign emails and text messages to Libertarian Party delegates.  Compl. [ECF No. 1] at 5.  Expenditures for these services, totaling $12,698.50, were duly reported to the FEC.  See Spending by McCutcheon for Freedom, FEC, https://www.fec.gov/data/candidate/P00016030/?cycle=2020&election_full=false&tab=spending (last visited Oct. 19, 2020)  McCutcheon has also stated that Mike Byrne served as his campaign manager and Ron Nielsen served as special advisor, although there are no recorded

disbursements from his campaign fund to either.  See id.; Compl. at 5.  McCutcheon does not appear to have made any media appearances or issued any policy statements.  The lone Twitter thread by Dave Levinthal of the Center for Public Integrity mentioning McCutcheon's campaign—cited in his advisory opinion request as an example of his "candidacy [being] discussed online," Compl. Ex. 1 [ECF No. 1-1] at 2—appears in fact to be the only coverage of his campaign prior to its suspension and his subsequent engagement with the FEC.  McCutcheon did not participate in any of the Libertarian Party's state primary contests or take part in any of the party's twenty-two primary debates, including the nationwide debate at the Libertarian National Convention on May 21, 2020.  See FEC's Mem. in Opp'n to Mot. for Prelim. Inj. ("Opp'n") [ECF No. 11] at 10–12 & n.3.  And his campaign's Facebook page made only three posts, which were simply links to his website and campaign video.  See McCutcheon for Freedom, Facebook (last updated May 13, 2020), https://facebook.com/McCutcheonforFreedom.

The Libertarian Party held its national convention from May 21–23, 2020, and Jo Jorgensen and Spike Cohen were nominated as the party's candidates for president and vice president, respectively.  Brian Doherty, Libertarian Party Picks Spike Cohen as its Vice-Presidential Candidate, Reason (May 24, 2020), https://reason.com/2020/05/24/libertarian-party-picks-spike-cohen-as-its-vice-presidential-candidate/.  McCutcheon did not receive any votes at the convention, see Opp'n at 12, and suspended his campaign thereafter, see Mem. of Law in Supp. of Pls.' Mot. for Prelim. Inj. [ECF No. 2-1] at 3.  At that time, he had approximately $54,000 remaining in his campaign account.  Compl. at ¶ 17.

B.  The Advisory Opinion Request

On May 29, 2020, Backer submitted a request for an advisory opinion to the FEC on behalf of plaintiffs.  Compl. Ex. 1.  McCutcheon appended a declaration in support of the advisory opinion

request setting forth facts relevant to the FEC's consideration.  Compl. Ex. 2 [ECF No. 1-2].  In addition to affirming many of the facts laid out above, McCutcheon's declaration states that he "was solely responsible for funding MFF," and "maintain[s] complete direction and control over MFF's funds and expenditures."  Id. at ¶¶ 8, 12.  Plaintiffs also appended McCutcheon's declaration to the present motion for a preliminary injunction.  Mot. for Prelim. Inj. Ex. 2 [ECF No. 2-2].

The purpose of the advisory opinion request was purportedly to obtain a determination that the following transactions (the "Proposed Transactions") are legal under FECA:[2]

1. McCutcheon transfers $50,000 of the personal funds he has deposited into the account of MFF, his authorized principal presidential candidate committee, to the general, unrestricted federal account of the Libertarian National Committee, Inc. ("LNC"), a national political party committee.

2. McCutcheon deposits unlimited amounts of additional personal funds into MFF's account, then transfers those funds without limit to the general, unrestricted federal account of the LNC and/or the general, unrestricted federal account of the Republican National Committee ("RNC"), a national political party committee.

Compl. Ex. 1 at 3.  However, the advisory opinion request paints a less-than-optimistic picture of the Proposed Transactions' legality.  It details the story of Bloomberg's $18 million contribution to the DNC described above and states that McCutcheon now "wishes to take advantage of the 'Bloomberg Billionaire Loophole,' . . . but wishes to confirm the legality of circumventing and undermining campaign finance law in this manner before doing so."  Id.  "Unlike Bloomberg," the request states, "McCutcheon cannot rely on the pervasively Democratic Deep State federal bureaucracy to shield him from administrative proceedings or criminal prosecution."  Id. at 1.

---

[2]  The Proposed Transactions underlying plaintiffs' advisory opinion request are the same as those plaintiffs ask this Court to declare legal and protect from adverse agency action through the issuance of a preliminary injunction. Compare Compl. Ex. 1 at 2, with Mem. of Law in Supp. of Pls.' Mot. for Prelim. Inj. at 15.

The legal analysis contained in the request largely mirrors the claims Backer pressed against Bloomberg in his March 24 FEC complaint.  Compare id. at 4–7, with Bloomberg Compl. All the request offers in support of the legality of the Proposed Transactions is to note that "[t]he supposed legal basis for this money laundering scheme is likely 52 U.S.C. § 30114(a)(4)," providing for unlimited transfers of "contribution[s] accepted by a candidate" to political party committees.  Compl. Ex. 1 at 3–4.  The request then goes on to describe, without qualifying, "four main reasons why the Commission may conclude the Bloomberg Billionaire Loophole is invalid, and it would be illegal for McCutcheon to engage in his intended course of action": (1) the transfers from his entirely self-funded campaign "must be treated as contributions directly from McCutcheon himself" in excess of individual contribution limits; (2) the transfers may "constitute illegal contributions in the name of another"; (3) McCutcheon's transfers of his own funds to MFF were not "contribution[s] accepted by a candidate" for the purposes of 52 U.S.C. § 30114(a)(4), and thus cannot be transferred without limit to a party committee; and (4) transfers of funds from an individual candidate to his own campaign committee that are not made in furtherance of his own campaign are not entitled to the protections afforded to campaign expenditures, and instead would constitute contributions in excess of legal limits.  Compl. Ex. 1 at 4–7.

On June 9, 2020, following an email exchange between the FEC and plaintiffs' counsel, the Commission deemed plaintiffs' advisory opinion request "complete," thereby starting the sixty-day clock for resolution.  See Compl. at ¶ 23.  On the same date, the request was made public for comment, opening the statutory ten-day public comment period, pursuant to which the FEC received one public comment from the Campaign Legal Center on June 19 arguing that the proposed transfers were illegal.  Opp'n at 14.  On or before July 20, FEC staff requested that plaintiffs waive or extend the sixty-day deadline, since the Commission lacked the requisite

quorum to even discuss plaintiffs' request, let alone render an advisory opinion with four affirmative votes.  Compl. at ¶ 24.  On July 20, plaintiffs declined.  Compl. Ex. 4 [ECF No. 1-4] at 1.  On August 10, FEC Associate General Counsel Nevin F. Stipanovic sent plaintiffs a letter indicating that the Commission was unable to render an advisory opinion for want of the required four-member quorum.  Id.

        C.   The FEC's Short-Lived Quorum

At the time the FEC received plaintiffs' advisory opinion request, it had not had a quorum since August 31, 2019.  Opp'n at 14.  On June 5, 2020, the FEC obtained a quorum when James E. "Trey" Trainor III was sworn in as its fourth Commissioner.  Id.  An extensive backlog of matters requiring a quorum to resolve existed at that time.  Id.  One Commissioner placed the number of staff reports awaiting Commission action when the quorum was restored at 248.  Statement of Comm'r Ellen L. Weintraub on the Restoration of the FEC's Quorum, FEC (June 18, 2020) (hereinafter "Weintraub Stmt."), https://www.fec.gov/resources/cms-content/documents/2020-06-18_ELW_quorum_restoration_statement.pdf.  Just three weeks later, on June 26, then-Commissioner Caroline Hunter announced her resignation from the FEC, which became effective on July 3, once again depriving the Commission of its four-member quorum.  Opp'n at 14.  The FEC did not release a draft advisory opinion in response to plaintiffs' request before, at, or after its lone open meeting during its short-lived quorum, which was held on June 18 amidst the ten-day public comment period.  Id. at 22 n.9.

        D.   The Present Action

On September 4, 2020, plaintiffs filed a complaint in this Court seeking injunctive and declaratory relief against the FEC, as well as a motion for preliminary injunction that would

"protect them from administrative, civil, or criminal proceedings or penalties for transferring personal funds in McCutcheon's campaign account to the LNC's general treasury notwithstanding any contribution limits set forth in [FECA]."  Compl. at 3.

The complaint presses four counts against the FEC.  Count I alleges that, "[b]y failing to fulfill its statutory obligation to issue an advisory opinion confirming the legality of McCutcheon's and MFF's intended course of conduct, the Commission has substantially burdened and chilled their exercise of First Amendment rights."  Id. at ¶ 34.  Count II alleges that "the Commission's refusal to issue an advisory opinion violated 52 U.S.C. § 30108(a)" and "deprived McCutcheon and MFF of the 'safe harbor' which Congress established under 52 U.S.C. § 30108(c)(2)."  Id. at ¶¶ 42, 44.  Count III alleges that, under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, the FEC "unlawfully withheld an advisory opinion" from plaintiffs, and that the Commission's failure to issue the requested advisory opinion within sixty days was "arbitrary, capricious, an abuse of discretion, and not in accordance with law."  Id. at ¶¶ 52, 54.  Finally, Count IV states a claim under the Declaratory Judgment Act, 28 U.S.C. § 2201, seeking a declaratory judgment that plaintiffs' Proposed Transactions are legally permissible.  Id. at ¶ 61.[3]

The FEC submitted its opposition to plaintiffs' motion for preliminary injunction on October 1.  In it, the Commission argues that plaintiffs have no right of action under FECA or the Declaratory Judgment Act, Opp'n at 2, and insists that plaintiffs' APA claims cannot stand because, among other reasons, the FEC was legally barred from rendering the requested advisory opinion within the sixty-day period after receipt of plaintiffs' request for want of a quorum, id. at 2–3.  The FEC further notes that "plaintiffs' purported First Amendment claim merely recasts their

---

[3] Plaintiffs seek similar declaratory relief in Counts I and II.  Compl. at ¶¶ 35, 44.

statutory claims" and "is based on the Commission's supposedly unlawful failure to issue an advisory opinion." Id. at 17 n.7.

### III.    Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Nat. Res. Def. Counsel, 555 U.S. 7, 24 (2008).  Before a preliminary injunction may issue, plaintiffs "must make a 'clear showing' that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in [their] favor, and accord with the public interest." Pursuing Am.'s Greatness v. FEC, 831 F.3d 500, 505 (D.C. Cir. 2016) (quoting Winter, 555 U.S. at 20, 22).

The first two factors are paramount in the preliminary injunction analysis.  First, "without a likelihood of success on the merits, [p]laintiffs are not entitled to a preliminary injunction regardless of their showing on the other factors." Brown v. FEC, 386 F. Supp. 3d 16, 24 (D.D.C. 2019) (citing Ark. Dairy Coop Ass'n, Inc. v. U.S. Dep't of Agric., 573 F.3d 815, 832 (D.C. Cir. 2009)); see also Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives, 920 F.3d 1, 10 (D.C. Cir. 2019) ("A foundational requirement for obtaining preliminary injunctive relief is that the plaintiffs demonstrate a likelihood of success on the merits.").  Further, the D.C. Circuit "has suggested, without deciding, that Winter should be read to . . . require[e] plaintiffs to independently demonstrate both a likelihood of success on the merits and irreparable harm." Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs, 205 F. Supp. 3d 4, 26 (D.D.C. 2016) (quoting Sherley v. Sebelius, 644 F.3d 388, 392 (D.C. Cir. 2011)).

As for the latter two factors, where, as here, the government opposes the issuance of a preliminary injunction, the Court analyzes both together "because the government's interest is the

public interest." <u>Pursuing Am.'s Greatness</u>, 831 F.3d at 511 (citing <u>Nken v. Holder</u>, 556 U.S. 418, 435 (2009)).

## ANALYSIS

Plaintiffs have asserted that a preliminary injunction is necessary to bar the FEC "from investigating them, commencing administrative proceedings against or concerning them, imposing civil fines or other sanctions, ordering the reversal of the transaction, or making a criminal referral" with respect to the Proposed Transactions.  Mot. for Prelim. Inj. [ECF No. 2] at 1.  Absent an injunction, plaintiffs claim, "the threat of such consequences continues to chill [them] from engaging in . . . constitutionally protected activities."  Mem. of Law in Supp. of Pls.' Mot. for Prelim. Inj. at 1.  The FEC retorts that plaintiffs' request "is at odds with the purpose of a preliminary injunction, which 'is merely to preserve the relative positions of the parties until a trial on the merits can be held.'"  Opp'n at 16 (quoting <u>Univ. of Tex. v. Camenisch</u>, 451 U.S. 390, 395 (1981)).  The Court will now analyze each of the relevant preliminary injunction factors,[4] placing due emphasis on the first two, to determine whether plaintiffs have met their burden to obtain the "extraordinary remedy" they seek.  <u>See</u> <u>Standing Rock Sioux Tribe</u>, 205 F. Supp. 3d at 26 ("[T]he Court may deny a motion for preliminary injunction, without further inquiry, upon finding that a plaintiff is unable to show <u>either</u> irreparable injury or a likelihood of success on the merits.").

## I.       Likelihood of Success on the Merits

Because plaintiffs fail to show a likelihood of success on the merits on any of the counts raised in their complaint, they are not entitled to a preliminary injunction.  <u>See id.</u>  ("[F]ailure to

---

[4] The FEC suggests that the court may in its discretion deny plaintiffs' motion on the grounds that plaintiffs failed to follow certain rules of procedure.  Opp'n at 15 n.6.  Because the FEC did not demonstrate any prejudice caused by plaintiffs' alleged procedural faults, the Court will proceed to the merits of plaintiffs' motion.

show a likelihood of success on the merits alone is sufficient to defeat a preliminary-injunction motion." (citing Ark. Dairy Coop Ass'n, Inc., 573 F.3d at 832)).  Fundamental to the Court's conclusion on this point is the plain fact that the FEC's conduct in processing and disposing of plaintiffs' advisory opinion request was not only legal, it was statutorily mandated.  Accordingly, to the concrete question of whether the FEC violated plaintiffs' rights—whether statutory or constitutional—by failing to issue a favorable advisory opinion, the answer is a firm no, and no suit based on such an allegation can possibly succeed.  At the same time, the Court's preliminary injunction analysis need not and will not reach a dispositive conclusion on the ultimate legality of the Proposed Transfers.  Suffice it to say, plaintiffs have not made the requisite "clear showing" that the Proposed Transfers are legal and/or constitutionally protected for this Court to shield them from any scrutiny by the very agency charged by Congress with resolving such questions of legality in the first instance.

A.  Count I: The FEC's Failure to Issue a Favorable Advisory Opinion Violated Plaintiffs' First Amendment Rights[5]

Plaintiffs' First Amendment claim alleges that, "[b]y failing to fulfill its statutory obligation to issue an advisory opinion confirming the legality of McCutcheon's and MFF's intended course of conduct, the Commission has substantially burdened and chilled their exercise of First Amendment rights."  Compl. at 12.  As the FEC correctly points out, plaintiffs "do not allege that either the individual limit on contributions to national parties, which was upheld in McConnell, or the unlimited transfer provision between a candidate committee and national parties

_____

[5] The FEC contends that plaintiffs "have not sought preliminary relief on their constitutional claim," Opp'n at 41, but the Court reads plaintiffs' motion as at least implicitly incorporating their constitutional claim, see Mem. of Law in Supp. of Pls.' Mot. for Prelim. Inj. at 9 (arguing that absence of a favorable advisory opinion left plaintiffs in a "constitutionally untenable position of either refraining from exercising their constitutional and statutory rights, or engaging in their intended transfers and facing the prospect of" enforcement), and will thus address the likelihood of that claim's success on the merits here.

are unconstitutional." Opp'n at 17 n.7. The constitutional harm alleged thus does not arise out of any law, regulation, or action taken or threatened by the FEC; instead, plaintiffs purport to be "chilled" in their right to free speech and association by the Commission's failure to issue the desired advisory opinion that would have blessed their proposed course of conduct.

For this claim to succeed, plaintiffs would, at a minimum, need to identify a constitutional right to transfer unlimited amounts of a candidate's personal funds that have been deposited into his or her campaign account to political party committees. They have not even attempted to do so. Plaintiffs accurately cite <u>Buckley</u> for the proposition that "a candidate has a constitutional right to make unlimited expenditures in support of his own campaign," but they go on to admit that "does not necessarily mean the candidate may make unlimited contributions of his personal funds to a political party committee by simply transferring them through his candidate committee." <u>See</u> Compl. at 8. In their motion for a preliminary injunction, plaintiffs once again fail to establish a nexus between political expenditures protected by the First Amendment and the Proposed Transactions: they assert that "federal regulations"—not the Constitution—"permit candidate committees to transfer unlimited amounts of their funds to national political party committees." Mem. of Law in Supp. of Pls.' Mot. for Prelim. Inj. at 12 (citing 11. C.F.R. § 113.2(c) ("funds in a campaign account . . . [m]ay be transferred without limitation to any national, State, or local committee of any political party.")). They then go on to aver that they are "likely to succeed in demonstrating that the Intended Transfers are legal," <u>id.</u>, not that they are protected by the Constitution. Plaintiffs' demure argumentation is a far cry from staking a constitutional right that the FEC allegedly violated by failing to issue a favorable advisory opinion.

Moreover, plaintiffs' constitutional claim presupposes that they are constitutionally entitled to a favorable advisory opinion and concomitant safe harbor protection for the Proposed

Transactions.  But they assume too much.  Congress placed a high bar for the issuance of FEC advisory opinions and the safe harbor they provide by requiring the affirmative votes of four of the FEC's six commissioners.  See 52 U.S.C. § 30106(c).  Considering that no more than three members of the FEC may be affiliated with the same political party, id. § 30106(a)(1), an advisory opinion request must be sufficiently meritorious as to generate a bipartisan consensus in order to secure the requisite level of support.  Plaintiffs have not pointed to any evidence indicating that their proposed course of action—which plaintiffs' counsel described as "willful campaign finance violations" when executed by Michael Bloomberg, see Bloomberg Compl. at 1—would have garnered the four votes necessary to obtain the safe harbor.

Plaintiffs' reliance on Carey v. FEC, 791 F. Supp. 2d 121 (D.D.C. 2011), in their reply brief to support the proposition that a preliminary injunction is constitutionally warranted here is unavailing.  See Pls.' Reply [ECF No. 12] at 6.  In Carey, the court issued a preliminary injunction against the FEC after the Commission failed to issue a requested advisory opinion[6] determining "whether it would be lawful for [a hybrid PAC] to accept unlimited contributions for the purpose of making independent expenditures" separate and segregated from its campaign contribution funds subject to FECA's contribution limits.  791 F. Supp. 2d at 127.  The court found that the plaintiff PAC was likely to succeed on the merits of its constitutional claim because the course of action proposed in its advisory opinion request was "squarely approved by [the D.C. Circuit's decision in] Emily's List, leading to the inevitable conclusion that [plaintiff] ha[d] a strong possibility of success on the merits."  Id. at 131 (citing Emily's List v. FEC, 581 F.3d 1 (D.C. Cir. 2009)).  Here, far from citing binding precedent to make the case for a constitutional right to

---

[6] In Carey, five members of the Commission split 3–2 on votes held on two draft advisory opinions.  Although there was a quorum, the draft opinions failed to secure the requisite four affirmative votes to issue.  See 791 F. Supp. 2d at 127.

conduct the Proposed Transactions as in <u>Carey</u>, plaintiffs' advisory opinion request focuses on developing counterarguments against the legality of the Proposed Transactions.  While this approach is consistent with plaintiffs' attorney's crusade against the so-called "Bloomberg Billionaire Loophole," it is not likely to propel plaintiffs' constitutional claim to success on the merits.

    B.  <u>Count II: The FEC Violated FECA by Failing to Issue an Advisory Opinion Within 60 Days</u>

Plaintiffs allege that the FEC violated 52 U.S.C. § 30108(a) when it failed to issue an advisory opinion within sixty days of determining that plaintiffs' request was "complete."  The FEC contends that this claim cannot succeed on the merits because no statutory cause of action exists under FECA to challenge its advisory opinion process.  Opp'n at 18.  The Court agrees.[7]

FECA includes certain limited provisions for judicial review of FEC action.  For example, 52 U.S.C. § 30109(a)(8) permits an aggrieved party to challenge the FEC's failure or refusal to act on a private administrative complaint like the one filed by plaintiffs' counsel against Bloomberg. Section 30109(a)(4)(C)(iii) entitles a person sanctioned by the FEC to seek judicial review.  And Section 30110 permits the FEC, the national committee of any political party, or any eligible voter to file suit to challenge or construe the constitutionality of any statutory provision of FECA. However, no other mechanisms for judicial review, nor other statutory causes of action, exist under FECA—including for judicial review of advisory opinions or the FEC's failure to issue them.  <u>See</u> <u>Unity08 v. FEC</u>, 596 F.3d 861, 866 (D.C. Cir. 2010) (reviewing challenge to adverse FEC advisory opinion under the APA).  Instead, as the D.C. Circuit has repeatedly held, agency actions, rules,

---

[7] Indeed, although plaintiffs have replied to some of the FEC's arguments contained in its opposition brief, they have not addressed the absence of an independent cause of action to bring Count II.

and regulations are subject to judicial review under the APA where, as here, "there is no other adequate remedy in a court." Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice, 846 F.3d 1235, 1238 (D.C. Cir. 2017) (quoting 5 U.S.C. § 704); see also Perot v. FEC, 97 F.3d 553, 560 (D.C. Cir. 1996) (per curiam) ("[A]n action challenging [FECA's] implementing regulations should be brought under the judicial review provisions of the Administrative Procedure Act.").

   C. Count III: The FEC's Failure to Issue the Requested Advisory Opinion Was Unlawful and/or Arbitrary and Capricious Under the APA

   Under the APA, 5 U.S.C. § 706(1) & (2)(A), plaintiffs allege that the FEC "unlawfully withheld"[8] from them a favorable advisory opinion, and that the FEC's failure to issue the requested opinion was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." See Compl. at 15–17. Because the FEC's conduct was in accordance with the law, both of plaintiff's APA claims are unlikely to succeed.

   With respect to plaintiffs' assertion that the FEC "unlawfully withheld" a favorable advisory opinion to which plaintiffs were otherwise entitled, the Supreme Court has made clear that "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take." Norton v. S. Utah Wilderness All., 542 U.S. 55, 64 (2004). If such a claim is found meritorious, the proper remedy is for the court to compel the withheld or delayed agency action. See 5 U.S.C. § 706(1). Although the FEC is required to render an advisory opinion in response to a complete request within sixty days of receipt under 52 U.S.C. § 30108, it is prohibited from issuing an advisory opinion without the affirmative votes

_____

   [8] Plaintiffs do not allege that the FEC "unreasonably delayed" its processing of the plaintiffs' advisory opinion request, see Compl. ¶ 52, so the Court limits its analysis to whether the Commission's failure to issue the requested opinion was lawful.

of four Commissioners approving such issuance under 52 U.S.C. § 30106.  There is nothing in the statute to suggest, nor have plaintiffs identified any authority to support, the proposition that the FEC is authorized to circumvent the four-vote requirement necessary to render an advisory opinion.  Indeed, FEC regulations permit the issuance of "a written response stating that the Commission was unable to approve an advisory opinion by the required affirmative vote of 4 members" in lieu of a requested advisory opinion.  See 11 C.F.R. § 112.4(a).  Plaintiffs do not purport to challenge the validity of that rule and the Court sees no reason to call it into question here.

Instead, the Court is called upon to "construe [the] statute[], not isolated provisions." King v. Burwell, 576 U.S. 473, 486 (2015) (citation omitted).  The two provisions at issue indicate Congress's dual intent that the FEC respond expeditiously to requests for advisory opinions, and that it only issue advisory opinions where a bipartisan majority of its members agree on the merits of a request.  If this Court—as it must—construes the statute "so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant," Hibbs v. Winn, 542 U.S. 88, 101 (2004) (citation omitted), plaintiffs are unlikely to succeed on the merits of their claim that the FEC unlawfully withheld the requested advisory opinion.  Indeed, to compel the FEC to contravene its statutory requirements and issue an advisory opinion with fewer than four affirmative votes would impermissibly "produce an absurd . . . result which Congress could not have intended," Clinton v. New York, 524 U.S. 417, 429 (1998) (citation omitted).

The temporary existence of a quorum during the pendency of the request does not change this conclusion.  There was a massive backlog of pending requests received before plaintiffs' request, see Opp'n at 22–23; Weintraub Stmt., and the FEC was not required to—nor could it reasonably be expected to—resolve all of those requests in just a few weeks.  As the FEC points

out, plaintiffs' request, having been rendered "complete" on June 9, "was not statutorily eligible for consideration at [the Commission's lone 2020 meeting on June 18] since the mandated public comment period had not yet closed." Opp'n at 22 & n.9 (citing 52 U.S.C. § 30108(d) (providing ten-day public comment period following the publication of a complete advisory opinion request)).

With respect to plaintiffs' claim that the FEC's failure to issue the requested advisory opinion was arbitrary and capricious under 5 U.S.C. § 706(2)(A), the parties dispute whether the FEC's failure to render the requested letter constituted a "final agency action" as is required for judicial review under 5 U.S.C. § 704. See Trudeau v. Fed. Trade Comm'n, 456 F.3d 178, 188 (D.C. Cir. 2006). However, the Court need not resolve that question to conclude that plaintiffs' arbitrary-and-capricious claim is unlikely to succeed on the merits, so it will assume, arguendo, that the FEC's August 10 letter did constitute a reviewable final action.

The bedrock principle underlying the Supreme Court's APA jurisprudence is that an agency "may not exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress enacted into law.'" Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 91 (2002) (quoting FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 125 (2000)); see also Lyng v. Payne, 476 U.S. 926, 937 (1986) ("[A]n agency's power is no greater than that delegated to it by Congress."). As already discussed, the FEC was not authorized to issue the advisory opinion requested by plaintiffs when it could not possibly have secured affirmative votes from four Commissioners—which are required to take such an action. A fortiori, then, the Commission's conduct was compelled by law and could not have been arbitrary, capricious, or an abuse of discretion. If anything, the FEC would abuse its discretion by rendering an advisory opinion without the requisite four-vote approval, and the Court would certainly not compel it to do so here.

23

D. <u>Count IV: Plaintiff Is Entitled to a Declaration Under the Declaratory Judgment Act that the Proposed Transactions Are Legal and Constitutionally Protected</u>

McCutcheon's request for a pre-enforcement declaratory judgment appears to seek a declaration that the proposed transfers are protected by the first amendment and/or are otherwise legal under FECA. The Declaratory Judgment Act empowers the Court to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought," as long as "a case of actual controversy" exists. 28 U.S.C. § 2201(a). The FEC contests plaintiffs' Count IV on the ground that "[t]he Declaratory Judgment Act does not itself provide a cause of action." Opp'n at 39 (quoting <u>Comm. on the Judiciary of U.S. House of Representatives v. McGahn</u>, 973 F.3d 121, 124 (D.C. Cir. 2020), <u>vacated pending reh'g en banc</u>, No. 19-5331 (Oct. 15, 2020)). The decision of the split panel of the D.C. Circuit in <u>McGahn</u> was since vacated pending rehearing en banc; but even assuming, again arguendo, that plaintiffs do have a statutory cause of action to press their claims under the Declaratory Judgment Act, <u>see</u> <u>McGahn</u>, 973 F.3d at 127 (Rogers, J., dissenting), such claims would likely fail on the merits.

As noted above, plaintiffs' arguments as to why the Proposed Transactions are likely illegal are more detailed and more robust on the record before this Court than their arguments supporting the Proposed Transactions' legality under FECA. In support of the Proposed Transactions, plaintiffs lay out a straightforward two-step analysis rooted in the FEC's regulations. First, a candidate for federal office like McCutcheon may make unlimited contributions to his own campaign. <u>See</u> Mem. of Law in Supp. of Pls.' Mot. for Prelim. Inj. at 12 (citing 11 C.F.R. § 110.10; FEC Advisory Op. 1984-60 at 2 (Jan. 11, 1985)). From there, his campaign committee may transfer unlimited funds to national party committees. <u>Id.</u> (citing 11 C.F.R. §113.2(c)). If these provisions stood alone, plaintiffs might well persuade the Court that the Proposed Transactions are legal under FECA. But they do not stand alone.

Plaintiffs' advisory opinion request presents forceful arguments against the legality of the Proposed Transactions, as do the allegations pressed by plaintiffs' counsel in his FEC complaint and public statements against identical conduct by Michael Bloomberg.  See Compl. Ex. 1 at 4–7; Bloomberg Compl.   The Court acknowledges that there appears to be some tension between FECA's provision for unlimited transfers from a campaign committee to a party committee on the one hand, and its safeguards against circumvention of contribution limits through conduits on the other.   In the case of a totally self-funded candidate like McCutcheon, it is indeed difficult to distinguish on principle a transfer of funds from his now-inactive campaign to a party committee from an individual contribution subject to statutory limits imposed to mitigate actual or apparent corruption in campaign finance.   In any event, under existing law, it is far from clear where the FEC—or a court deciding the question on the merits—would come down.   Accordingly, plaintiffs have not met their burden to establish a likelihood of success sufficient to justify the "extraordinary remedy" of granting a preliminary injunction, see Winter, 555 U.S. at 24, that would hamstring the FEC's enforcement powers.   The FEC is statutorily empowered to interpret FECA in the first instance and should do so via advisory opinion once a quorum is obtained; in the meanwhile, the Court will not fill in and assume that responsibility.   See 52 U.S.C. §§ 30106-09; see also FEC v. Democratic Senatorial Campaign Comm., 454 U.S. 27, 37 (1981) (holding that the FEC is "precisely the type of agency to which deference should presumptively be afforded").

Nor does the First Amendment provide a right likely to entitle plaintiffs to declaratory relief.   There is no constitutional right for an individual to make contributions to a political party committee in excess of the limits set by Congress, whether directly or through a conduit.  See McCutcheon, 572 U.S. at 192–94 ("[W]e have previously upheld [base limits] as serving the permissible objective of combatting corruption. . . . The base limits apply with equal force to

contributions that are 'in any way earmarked or otherwise directed through an intermediary or conduit' to a candidate." (quoting 2 U.S.C. § 441a(a)(8))); McConnell, 540 U.S. at 142–45.  And as discussed above, plaintiffs do not appear to argue that FECA's provision for the unlimited transfer of campaign funds is rooted in the First Amendment.

E.  Summary

For the foregoing reasons, plaintiffs have not satisfied the "foundational requirement" of showing a likelihood of success on the merits to warrant the extraordinary relief of a preliminary injunction.  See Guedes 920 F.3d at 10; see also Brown, 386 F. Supp. 3d at 24 ("[W]ithout a likelihood of success on the merits, [p]laintiffs are not entitled to a preliminary injunction regardless of their showing on the other factors.").  The Court thus need not reach the other preliminary injunction factors to deny the motion, but will briefly discuss why they, too, are not satisfied.

II.  **Irreparable Injury**

Plaintiffs will not suffer irreparable injury upon this Court's denial of their motion.  The D.C. Circuit "has set a high standard for irreparable injury," demanding that the purported injury "be both certain and great . . . actual and not theoretical." Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006) (citation omitted).  Further, plaintiffs must make a "clear showing" that preliminary injunctive relief is necessary to avoid irreparable harm; a preliminary injunction may not issue "based only on a possibility" that plaintiff will otherwise be harmed.  Winter, 555 U.S. at 22.

Plaintiffs allege two classes of irreparable harm, neither of which comes close to the "clear showing" required to obtain relief.  First, they cite the D.C. Circuit's opinion in Unity08 for the

proposition that the FEC's failure to issue their requested advisory opinion deprives them of a legal right to the safe harbor protections afforded to recipients of favorable FEC advisory opinions. Mem. of Law in Supp. of Pls.' Mot. for Prelim. Inj. at 12–13 (citing 596 F.3d at 865). But Unity08 was not a preliminary injunction case at all: it was a challenge to a duly rendered unfavorable advisory opinion under the APA. See 596 F.3d at 863. As discussed supra, here the FEC was not legally authorized to issue the plaintiffs' requested advisory opinion, much less required to do so. A preliminary injunction extending the safe harbor protections that the requested opinion would afford would thus displace the process Congress put in place for extending those protections. Such an outcome would cause harm to the balance of powers more than it would prevent harm to plaintiffs. See SEC v. Chenery Corp., 318 U.S. 80, 88 (1943) (holding that a "court cannot intrude upon the domain which Congress has exclusively entrusted to an administrative agency").

Plaintiffs further claim that they will suffer irreparable harm through the chilling of their First Amendment right to execute the Proposed Transactions. Once again, plaintiffs have not articulated a constitutional basis for FECA's allowance of unlimited transfers of campaign funds to party committees that would entitle them to preliminary injunctive relief. They cannot suffer infringement of a First Amendment right that does not exist. The cases plaintiffs cite in their motion and reply uniformly involve assertions of recognized constitutional rights that are jeopardized by statutes, agency actions, or regulations that improperly burden those rights. See, e.g., Buckley, 424 U.S. at 22 (First Amendment right to make campaign expenditures necessary to political speech); McCutcheon, 572 U.S. at 203 (First Amendment right to contribute an unlimited amount of money during an election cycle, provided that contributions comply with FECA base limits); Carey, 791 F. Supp. 2d at 136 (First Amendment right of non-profit to receive unlimited contributions for independent expenditures); Woodhouse v. Me. Comm'n on Gov.

27

Ethics and Election Pracs., 40 F. Supp. 3d 186, 195–96 (D. Me. 2014) (equal protection right for third-party candidates to receive up to the same amount of campaign contributions as major-party candidates); Fund for La.'s Future v. La. Bd. Of Ethics, 17 F. Supp. 3d 562, 575 (E.D. La. 2014) (First Amendment right of independent group to raise unlimited funds to make independent expenditures).  But here, plaintiffs do not even challenge the constitutionality of the statute they claim ultimately to be chilled by—the FECA limit on contributions to political parties.  Indeed, such an attack would likely fail under McConnell.  See Republican Nat'l Comm. v. FEC, 698 F. Supp. 2d 150, 159 (D.D.C. 2010) (rejecting, via three-judge panel, as-applied challenge to limits on contributions to party committees because "contributions to national parties have much the same tendency as contributions to federal candidates to result in quid pro quo corruption or at least the appearance of quid pro quo corruption" (citing McConnell, 540 U.S. at 144)).[9]  Instead, then, plaintiffs attack the FEC for failing to give them a pass to engage in conduct they readily admit "may violate federal law."  Compl. Ex. 1 at 8.

Any harm plaintiffs might suffer from their inability to make potentially illegal contributions to a political party is a far cry from the harm the Supreme Court recognized in McCutcheon, where McCutcheon was barred from associating with campaigns that represented his policy preferences after he hit the aggregate limits then in place for a given campaign cycle. See 572 U.S. at 203.  Hence, "[p]laintiffs will not 'suffer irreparable harm in the absence of preliminary relief'; they will simply be required to adhere to the regulatory regime that has governed campaign finance for decades." Rufer, 64 F. Supp. 3d at 206 (citation omitted) (rejecting request for preliminary injunction against enforcement of limits on contributions to political party

---

[9] If plaintiffs did wish to challenge the constitutionality of any of FECA's provisions, the proper way to do so would be to file suit under 52 U.S.C. § 30110 requesting District Court certification of their constitutional challenge to an en banc panel of the D.C. Circuit.  See Holmes v. FEC, 823 F.3d 69 (D.D.C. 2016).

committees).  Within the bounds of that regulatory regime, as the FEC points out, plaintiffs are clearly entitled to contribute up to $35,500 to both the LNC's and RNC's general treasury accounts, and may contribute much more to their non-general accounts, provided that such contributions are properly disclosed and comply with applicable limits.  See Opp'n at 13, 43.

## III.    Balance of Equities and Public Interest

Needless to say in light of the foregoing, the balance of equities does not favor granting plaintiffs' motion, nor would an injunction be in the public interest.  The 2020 elections are just weeks away, and granting plaintiffs' motion could add yet another drop of chaos into the ocean of tumult that has characterized this year.  See Rufer, 64 F. Supp. 3d at 206.  Plaintiffs' motion advances a novel legal theory they contend underlies the so-called "Bloomberg Billionaire Loophole," but they spend more time disparaging the alleged loophole than advocating for it.  To grant the requested relief here would thus blaze a rocky and uncertain legal trail and fly in the face of the Supreme Court's admonition that "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."  Camenisch, 451 U.S. at 395.

## <u>CONCLUSION</u>

For the reasons stated above, the Court will deny plaintiffs' motion for preliminary injunction.  A separate order will be issued on this date.

/s/<br>
JOHN D. BATES<br>
United States District Judge

Dated: <u>October 19, 2020</u>